Good morning. Welcome to the United States Court of Appeals for the Sixth Circuit. Please call the first case. Case number 15-5061, Rochelle Johnson v. Patrick Donahoe. Court argument is about to proceed 15 minutes per side. Ms. Caldwell will be appellant. And if you have reserved time with the clerk, please let me know what you did and then I'll be sure to call upon you. Yes, sir. I have reserved four minutes. Please proceed. Thank you, Your Honor. Judge McKee, Judge Merritt, Judge White, it's my honor to represent Rochelle Johnson in this case against the United States Postal Service. This is a Title VII case. It was decided on summary judgment below. The fact pattern covers not one year, it covers four or five years. It's very convoluted and somewhat complex. The standard of review for this court is de novo. It is dealing with legal conclusions by the district judge and the grant of summary judgment. And it governs all of my issues. We contend that the district court erred in granting summary judgment on the issues before the court. And we contend that she did not follow the proper legal standards, that she made ultimate decisions, that she was not weighing the evidence and the like most favorable to that of the non-movement. And we've made that argument repeatedly throughout our brief, but I think that the overwhelming most important thing to say to you is just that, that there was a weighing of evidence. There is a tendency on the district court level to clear dockets by granting summary judgment. And this is just exactly that type of instance. If this case has an inherent weakness, it is the complexity of the fact pattern. And that does not mean, however, that we have not put forward the proper proof. If we proffered all of the information needed to show all of our prima facie burdens, both as to the discrimination based on sex, the discrimination based on retaliation, and then harassment. In terms of sex, this issue is largely concerning the denial of off-day overtime. There were two people who had Saturdays as their off-days. One was my client, Rochelle Johnson. The other was Dexter Moraney. And the proof that we have put forward, that we have proffered, shows that Mr. Moraney was given wide latitude. He was given the off-day overtime that Ms. Johnson was supposed to have rotated with him by policy. Well, the explanation they give is that there were jobs that had to be done that required lifting and things like that, that she was not able to do at that time. That was an excuse, Your Honor, but there was no evidence to that point. That was only a position taken by the Postal Service. And what we were able to show, and I think if you read my brief, I have given quite a few citations to the record on that point, that Dexter Moraney clock rings showed that he was doing light duty, that he was known to be working in a particular area where he was simply doing paperwork, that he did not load or unload trucks. And that's one of the cruxes of this case is Ms. Johnson. But wait a minute. You say there's no support for any of this. There's no question that she had an injury. No, none. There's no question that she was put on restrictions by her doctor. Right. There's no question about what at least the position description said as to the duties that somebody had to perform if they were there on Saturday. Right? The description, not what actually happened. Your Honor, I can't speak to that as I stand here. I don't recall that position. You have to be able to speak to that because they say that they didn't give her that assignment because the job duties in the manual or whatever it is require her to be able to do things that a restriction didn't permit her to do. There didn't seem to be any dispute about that. Your argument is, well, that isn't what the guy actually did when he was there. But I can't find any case law that says you, because trucks don't come in on Saturday. I'm making that up. But let's assume that's the case. Just because trucks don't come in regularly on Saturday doesn't mean the employee that's there doesn't have to have the ability to unload the truck if it does come in. Well, that's true except for one thing. The job description of a mail processing clerk does not include loading and unloading trucks. And that is absolutely the points that I made in my brief and I cited to various testimonies. One of the labor specialists said, well, I'm not aware I've ever assigned a mail processing clerk to unloading a truck. In another instance, there was a lot of testimony that it's mail handlers that load and unload trucks. Let's forget the trucks for a minute. Maybe you're right about that. But the duty requirements are set forth in something called apparently a duty status report, and they're set forth in the bargaining unit qualification standard for mail processing clerk level five. Am I right about that? Yes, sir. Now, those things both say, as I understand it, that you have to be able to lift up to 70 pounds. And she could do that. Now, the restriction, I thought, said she couldn't do that. Well, she was getting a lot better, Your Honor, and she was lifting those weights. Time out. Time out. Does the restriction say she can't lift over something less than 70 pounds? It did at one time. So the way normally that would work is if the employer says you can't do that job because of your restriction, but the employee says they can do the job, you go back to the doctor and you get the restriction changed. Did she do that? I believe she did, Your Honor. Is that in the record? I cannot tell you that. I can tell you this. Well, if it's not in the record, if all we have is a restriction that she can't lift over 70 pounds and the job duties that I've just read to you say she has to lift over 70 pounds, how could you possibly win on a sex-based pretext argument? I could win because I can show, and it's in my brief, that she was being required to do such things as lift bundles. Lifting of bundles is the same sort of duty as loading and unloading trucks. It might not be 1,200 pounds, but it was certainly well over 75, and she was doing that on a regular basis. But if the restrictions say she can't do it, she shouldn't have been allowed to do it to begin with. It isn't while she was really doing it, so now they can't give her that assignment. You've got to just, intuitively, it seems like you've got it backwards. It does. It does. But this was the environment she was working in. Why don't you think about whether there is evidence in the record that she got the restriction lifted to comport with what she was actually doing because then your argument would make a lot more sense. It would make a lot more sense, but I can't tell you about something that I don't believe exists. I don't believe there's anything in the record from her treating physician lifting that restriction. So, in other words, the bottom line here is the post office was not entitled to abide by her restrictions in deciding what duties to give her. They had to ignore her medical restrictions. If they had sent her something that said, your medical restrictions prohibit this, then she might have taken action differently. I cannot tell you anything other than what actually happened, Your Honor, and what actually happened was she was lifting beyond her weight restrictions on a regular basis, although she was objecting to it, and they did nothing about it Monday through Friday. The importance of off-day Saturdays is obvious. That is an eight-hour shift of overtime. It's significant overtime. She did work some overtime. Early morning shift, she'd come in an hour or two early as requested. That later was denied her. We have a lot of denial of overtime to this lady. That's part of the retaliation claim, not the sex discrimination claim. But what you have here is a pattern in which her restrictions were normally ignored, and there was absolutely no proof that Dexter Moraney was called upon to lift more than 75 pounds on his Saturdays. He wasn't doing that. Did she get overtime up to a particular point in time? She got overtime, Your Honor, and I really pinned that down, I think, in the brief very precisely, up until about 07, and then at that point things really fell apart, and she was denied overtime by 08 and 09 routinely. And yet she did get some of it, right? Well, she had previously. Occasionally she would, but not regularly. And given her seniority, her super seniority, she should have rights to some of this over other employees.  Oh, yes, ma'am. And what was the answer that was given her? Well, in one instance, a labor specialist said, well, we don't like EEOs around here. That was one explanation. That was the response to the question about her overtime? Yes, Your Honor. And in another instance, I'm trying to remember it in context. I think it was Mr. Witten had applied for a promotion, and he did not get it, and he told Ms. Johnson that the reason he didn't get it was because of her EEOs. Do you realize you're now skipping from your sex discrimination argument to the retaliation? I am absolutely skipping. I'm skipping because I think it's responsive, and I don't mean to muddle up. This case is really hard to stay here, stay on sex, stay on retaliation, because they blend. But I think it was Mr. Witten who missed a promotion and told Ms. Johnson it was on account of her EEOs and that he would see to it that she never got overtime again. Now, is that responsive, I think, to the overtime issue? I think it is. So overtime was a tool to retaliate. It was not the only one. Overtime was certainly an issue in the sex discrimination portion of the case. The question is whether in any of these instances— Can you tell me when Wittenberg said that? I can look it up, Your Honor. It's in the brief. Do you want me to do so? When you come back. Pardon? When you come back. Or I can find it. I'll be glad to. It is clearly in there, and I think it's Mr. Witten. All right, your light's on, so think about that. Well, I didn't get very far. Thank you very much. Your Honors, may it please the Court, I'm David Brackstone of the United States Attorney's Office on behalf of the Postmaster General. You've begun to hear the beginning of what are a lot of allegations in this case. Few of those allegations are actually before this Court, and even fewer of them are supported by the record in this Court, including the most recent allegations regarding statements about EEOs and retaliation. In responding to the Postmaster's summary judgment motion, Ms. Johnson filed a lengthy affidavit and a lengthy response to the Statement of Undisputed Material Facts. Those documents were full of conclusory statements, were full of irrelevant information, weren't in compliance with Rule 56 of either the Federal Rules of Procedure or the local rules. Was she represented at this time? Yes, Your Honor, she was. Why did that get filed then? I can't speak to that, Your Honor. But it was never stricken? When there were two summary judgment motions filed, those documents were filed in response to the first of the summary judgment motions. A motion to strike was filed. The District Court cautioned that they were replete with irrelevant and nonresponsive facts, legal argument, and other improper information, and said, in responding to a subsequent summary judgment motion, Ms. Johnson, keep in mind the Civil Rules of Procedure, the Rules of Evidence, and the local rules. Those documents were simply reincorporated in response to the second summary judgment filing. A new objection was made and was not ruled on. However, in the order granting summary judgment, the District Court again pointed out the deficiencies in those documents and, though it's not made explicit, apparently did not grant weight to those documents because they were not in compliance with the rules. Well, I mean, you take what's appropriate and you ignore the rest. So if there are statements of fact in there based on personal knowledge, I think we can consider them. But let's just go back. She didn't get all the overtime she would have gotten if things were operating normally. That's correct, Your Honor. In April of 2007, Ms. Johnson—I believe it was April of 2007— Ms. Johnson suffered a cervical spine injury. From April 2007 until her retirement, as Judge McKeague pointed out, there are duty status reports indicating Ms. Johnson's duty restrictions, and she was under a restriction the entire time from April of 2007 until her retirement in 2009. And to be clear, this is not just a question of lifting 75 pounds. The restrictions included pushing and pulling, reaching above the shoulder, and on one form even indicated that sorting activity should be restricted to, I believe, two hours, when the primary purpose of Ms. Johnson's job was sorting mail. Her argument seems to be that she was actually exceeding those limitations during the week, so she should have been permitted to exceed them on the weekend. That may be her argument now, but in her deposition, Ms. Johnson admitted under questioning that she was never worked outside of her limitations. And so to come before this court now and suggest otherwise simply isn't supported by the record. Assuming that takes care of that argument, then her other argument is the mail that was permitted to work on the overtime she says she should have gotten on Saturday didn't have to do anything that exceeded her restrictions. Your Honor, I believe that the argument was actually that he did not have to lift over 75 pounds or unload trucks. However, because the restrictions included such trivial things as reaching above the shoulders, tasks that Ms. Johnson admitted in deposition she had to have other clerks assist her with during her normal work hours, that her restrictions were such that she couldn't complete even the regular tasks without assistance. If you have... Well, let's assume that's the nuanced part of her argument, so I guess she would then say she should have been provided with that assistance and allowed to do the overtime on the weekend. You know that's what she's going to say when she stands back up. Your Honor, the receipt of overtime is not a guaranteed part of Ms. Johnson's employment, and there's no evidence in the record and no argument has been made up to this point that Ms. Johnson was entitled to have someone assist her in providing or performing her duties. How many people work overtime in that spot at one time? At one time, typically one, Your Honor. One, okay, so it's a single job. Yes, Your Honor. Is part of the answer then there would be people available to help her during the week but not on the weekend because it's a smaller staff? Is that what you're saying? No, there would be approximately the same number of people once you brought in overtime employees working on any given day. The idea is to keep a full complement of staff. It's just that due to people's off days, there was additional need on Saturday or on the holidays. Then if it's just like every other day, why shouldn't it be just like every other day? Because, Your Honor, if you have the discretion of who to pull in and fill that gap in scheduling, the employer is entitled to bring in an employee who can do the entire task rather than pay someone extra who's going to detract from the other employees performing their normal work duties on that day. Your response on this EEOC set of comments by who is it, Johnson? Ms. Johnson? Yeah. Mr. Witten. Witten, Witten. What is your response to that again? Simply that there is no admissible evidence in the record to support that position. You never filed a deposition or an affidavit to that effect? The only information that I can recall on that point was in the largely irrelevant and non-responsive affidavit that was filed with the response to the summary judgment motion, and it was unsupported by any other facts. And in this district, conclusory statements are not sufficient. I don't get that. If the question is what somebody said, if the question is they heard somebody say something, as long as it's not secondhand, as long as they heard it, they can say this is what I heard the guy say. It could come from her. It could come from a third party. So what's the evidentiary problem with that? Well, even if there is no evidentiary problem, Your Honor, you have. . . Well, the answer is there is not an evidentiary problem. Well, without. . . An alternative argument, I guess. Without examining the affidavit to look specifically at how the claim was made, I can't speak to what evidentiary problem it is. You agree that she can testify in an affidavit as to what she says she heard somebody say? In general, yes, Your Honor. All right. However, even if that particular statement is admissible, as Your Honor has already suggested, it is irrelevant to the overtime issue, which is strictly based on sex discrimination, and that claim, if it were true, if it existed, deals only with retaliation, and it simply doesn't apply to her denial of overtime. Well, isn't part of the retaliation claim that she didn't get the overtime? I don't believe so, Your Honor. The facts and complaint are perhaps a bit confusingly constructed. My understanding is that the retaliation does not apply to the overtime but applies to an alleged hostile work environment. Well, let's assume that the alleged hostile work environment includes not getting overtime, and you have a situation where they could have given her the overtime. Maybe they weren't obliged based upon what you're saying, but they certainly could have because she'd been working in the same environment Monday to Friday, and then somebody tells her, we don't like EOs here, and you're not going to get any overtime, and then she doesn't get the overtime. Why isn't that enough? I would suggest to Your Honor that it's because the person who allegedly made this statement had nothing to do with the assignment of overtime. He didn't work in this facility. He was not the plaintiff's manager. He didn't make those decisions, and so Mr. Whitten's opinion on whether the plaintiff should have overtime or not wouldn't actually play into the on-the-ground decision to grant her overtime. Who exactly made that decision? The decision would be made by the manager or supervisor at the facility. And who was that? Do you know? There are a number of them, Your Honor. And what would be the relationship between Whitten and those people? Housed in different facilities. Didn't know each other or didn't communicate or what? I'm certain they knew each other. There's no evidence that they communicated about this, and I don't believe there's been any allegation that they've communicated about this. Well, why would Whitten have anything to do with these complaints that she made? The complaints that Whitten would be involved with relate to other aspects of plaintiff's employment, including her move from the Holiday City Station, where she was working, to the airport station, where she ultimately worked, which is an area that Ms. Johnson complains about. And I would argue to Your Honors that that move was made because Ms. Johnson bid on and was awarded a position at airports. Well, I mean, she did that because she had to. It's not like she woke up one morning and said, oh, I'd love to work at the airport. I mean, she was forced into that. I would disagree, Your Honor. Ms. Johnson was alerted that within a year, the carriers carrying mail out of her station and for whom she sorted mail would be moving to a different facility. She, along with everyone else, was encouraged to bid on new positions. She did not have to bid at airport stations. She could have bid anywhere in Memphis. She elected to bid on a job at airport station, presumably because it offered good off days, a Saturday-Sunday off day. But she elected to bid on that position, and then she won the position. She was told the truth. These carriers will be moving. The job of sorting mail for these carriers will be abolished at this station and brought somewhere else. If she wanted to continue working that position, she did the correct thing, and it wasn't unique to her. It was the same for every single sorter of mail for those mail carriers at her facility. I thought the whole argument that you were making is she bid on the airport position because she didn't want to go downtown, whatever downtown is. The airport facility is— That's not downtown, is it? I believe downtown is the parcel distribution center. So, no, it is not downtown. Let me take you back because I'm still confused about your argument about these comments that she says that she heard made about we don't like people that file EEOC complaints. You want to say, well, that's just retaliation. But it's not just retaliation. It also can be used, can it not, to show that your legitimate reasons in your sex discrimination claim are a pretext. They don't fit in neat little baskets here. They do not, Your Honor. So if I'm right about that, then what you didn't say, and so I want to make sure I've got this right, is that that denial of overtime that she claims is unlawful actually started about a year before the EEOC complaint, if I understand that correctly. So if that sequence is right, the real response would be it's obviously not related to filing the complaint because it was happening before the complaint. That is correct, Your Honor. But there are all kinds of complaints. She's been filing complaints virtually, it looks like, her whole career. So how do we figure out which complaint went to what and what complaint somebody was referring to if they made a stray EEOC complaint animus remark? It is admittedly extremely difficult, Your Honor, and I would suggest that one solution to that is of all of the complaints that are properly included in the claims before this court, the ones that were litigated here, all of the instances of alleged discrimination or retaliation occurred several months after any alleged protected activity, and under the law in this circuit, that by itself can be enough to defeat the causation. And so Your Honors can look at the time difference between when a complaint was filed, when a complaint was argued in the EEO procedure, and when Ms. Johnson complains about an activity at work. It just means the further away you get, you have to show more, basically. Yes, Your Honor. And in this case, we're talking several months to six months, nine months between an EEO complaint and an alleged act of discrimination. Thank you. All right. Thank you. I can't say what I need to say in four minutes, but Judge White, it was Mr. Cash who blamed my client because of her EEOs for missing a promotion. That's on page 49 of my brief. How did Cash relate to the things that you're complaining about here? He was one of the, from time to time, he was acting manager of the branch. But is there evidence in the record that he was a decision maker in connection with any of these things? Absolutely he was a decision maker, yes. And he started talking to the other supervisors. He tried to get her disciplined. She requested bereavement leave when her mother-in-law died. Mr. Cash is the person who denied it. He is part and parcel of this case throughout. The other thing I'd like to say very quickly, it was said just now that something happened. There was an EEO complaint, and it was several months later before there were other activities. I addressed that in my brief starting at page 49, and it goes on for several more pages, and it's almost monthly something was happening, boom, boom, boom. It was consistent. And this is a case of temporal proximity times three. It is very clear that she was in a very hot environment of harassment and that actions were being taken and that she was conducting numerous EEO activities and that her supervisors knew it and the harassment came, in the middle of which she was denying off-day overtime by Mr. Tate. The two labor specialists may not. Did Tate have a relationship with Cash? Yes. Yes, they did. And the difficulty when you ask a very straight question is I want to give a precise answer. The station manager left, and then her position was taken up by various persons from time to time. But Tate was in upper management, and Williford was, and these people all worked together, Your Honor. How many EEOC complaints did she file over the? Over her career, I cannot answer that. I can tell you that I itemized the ones relevant to the instant case. At the very start of this action, there are four separate formal EEOs that were filed, one on November 16 of 06, one on May 10 of 08, December 22 of 08, and June 12 of 09. There had been a lot before then? There had been several. Yes, there was one in 04, for example. The answer is there were 13. Yes, sir. That sounds okay. And there may have been more than that. Well, I'm just looking at the EEO Counselor's Report. That says 13. Okay. I would accept that. Certainly my client knew her rights, and she acted on them. The problem that that creates, and if you have an observation, I'd be happy to hear it, is that when somebody files a lot of complaints, and I'm not suggesting for a second that she didn't have a right to file those complaints, but it almost becomes a question then of whether all those complaints, because they're going to be temporarily close to something that she's complaining about, then essentially inoculates her and creates then a basis for any adverse action that she claims happened because she happened to have filed a complaint about something. Well, that's the risk that is run by an agency that has enough problems that have given employee files repeatedly. Nothing was ever done to stop this kind of stuff. The flip side of that, of course, is that you could, in theory, have an employee that is overly sensitive and files a complaint about everything. So the truth is probably somewhere in between, I would say. Somewhere in between, but I think that she was not. Don't cast her as a writ writer. She's a person who had bona fide complaints. She had overtime taken away from her that resulted in loss of monetary amounts that can be computed. She was... I suppose one way to look at it, but I bet it's not in the record, is what happened to all the other complaints. If they were all resolved in her favor, then you would certainly correctly say, look, this is a rogue agency. If she lost every one of those complaints, they would say she's a rogue employee. I believe she won at 0-4, but it's mine. I didn't represent her at that time. I didn't represent her when this case was filed. So the point is we don't know. Well, I'm not going to mislead the court, but I believe she won the 0-4. What precipitated the loss of overtime? That's a really good question. It was something that she had enjoyed and they took it away from her. And it was the person who got what she had been enjoying was male, Mr. Moraney, and that is what is clear on the record. Do you at least concede that it occurred after she had an injury and had her work restriction? No. No, she had the cervical injury, I believe, before the loss of that Saturday overtime. She did have other overtime losses after the cervical injury. The cervical injury was caused on the job because she was lifting weights heavier than she should have been lifting. And she was being assigned work duties. I'm not sure I followed your answer. Okay. Can you tell me? Okay. Did she start losing overtime inexplicably before the cervical injury? That's my understanding. Yes. Is there some evidence in the record to support your understanding? Yes, sir. You can look at the pattern of the EEOs and the administrative complaints. You can look at the date of the cervical injury and you have that. It's in the record. And I believe that you will see that all of this is a very large pattern that's very difficult to untangle. It's not, you know, when you ask a very clear and obvious question, I like to give an obvious answer. Let me try this. In one of her affidavits, she said that they skipped over her in the overtime rotation in January and March 2008, five times in May and June 2008. Does that sound about right? No, she had already had some overtime losses before that. Because her injury was in 2007. Yes. So where do you say the record supports the claim that she didn't get overtime that she was entitled to prior to April 20, 2007? I believe it does. Where would we look for that? I can't tell you as I stand here, Judge. Thousands of pages. All right, thank you. Thank you. Case will be submitted.